# Matter of W-G-R-, Respondent

*Decided February 7, 2014*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1)   In order to clarify that the "social visibility" element required to establish a cognizable "particular social group" does not mean literal or "ocular" visibility, that element is renamed as "social distinction." *Matter of E-A-G-*, 24 I&N Dec. 591 (BIA 2008); *Matter of S-E-G-*, 24 I&N Dec. 579 (BIA 2008); *Matter of A-M-E- & J-G-U-*, 24 I&N Dec. 69 (BIA 2007); and *Matter of C-A-*, 23 I&N Dec. 951 (BIA 2006), clarified.

(2)   An applicant for asylum or withholding of removal seeking relief based on "membership in a particular social group" must establish that the group is (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question.

(3)   An applicant has the burden of demonstrating not only the existence of a cognizable particular social group and his membership in that particular social group, but also a risk of persecution "on account of" his membership in that group.

(4)   The respondent did not establish that "former members of the Mara 18 gang in El Salvador who have renounced their gang membership" constitute a "particular social group" or that there is a nexus between the harm he fears and his status as a former gang member.

FOR RESPONDENT:  Alma L. David, Esquire, Seattle, Washington

FOR THE DEPARTMENT OF HOMELAND SECURITY:  Marci L. Ellsworth, Senior Attorney

BEFORE:  Board Panel:  GRANT, MALPHRUS, and MULLANE, Board Members.

GRANT, Board Member:

In a decision dated January 14, 2010, an Immigration Judge pretermitted the respondent's application for asylum, denied his applications for withholding of removal under section 241(b)(3) of the Immigration and Nationality Act, 8 U.S.C. § 1231(b)(3) (2006), and protection under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment  or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, 198, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the

United States Apr. 18, 1988) ("Convention Against Torture"), and ordered him removed from the United States. The respondent has appealed from that decision.[1] The Department of Homeland Security has filed a brief in opposition to the appeal. The respondent's appeal will be dismissed.

## I. FACTUAL AND PROCEDURAL HISTORY

The respondent is a native and citizen of El Salvador who was a member of the Mara 18 gang in that country. He testified before the Immigration Judge that he decided to leave the gang after being a member for less than a year. According to the respondent, members of his former gang confronted him after he left the gang, and he was shot in the leg during one of two attacks he suffered. He fled to the United States after he was targeted for retribution for leaving the gang. The respondent claimed that he feared persecution on account of his membership in a particular social group consisting of "former members of the Mara 18 gang in El Salvador who have renounced their gang membership." The Immigration Judge found the respondent credible, but he concluded that the respondent had not established that he was persecuted on account of his membership in a particular social group within the meaning of the Act.

## II. ISSUE

The primary issue on appeal is whether former Mara 18 gang members in El Salvador who have renounced their gang membership constitute a particular social group.

## III. PARTICULAR SOCIAL GROUP

### A. Background

"The term 'particular social group' is ambiguous." *Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1083 (9th Cir. 2013) (en banc). Determining whether a specific group constitutes a particular social group under the Act is often a complicated task. While the analysis of a particular social group claim is based on the evidence presented and is often a fact-specific inquiry,

---

[1] The respondent does not challenge the Immigration Judge's decision to pretermit his asylum application as untimely filed, so that issue is not before us. *See Matter of Kochlani*, 24 I&N Dec. 128, 129 n.3 (BIA 2007).

the ultimate determination whether a particular social group has been established is a question of law.

We first attempted to define the contours of the term "particular social group" in *Matter of Acosta*, 19 I&N Dec. 211, 232 (BIA 1985). In that case, we concluded that any characteristic that defines a particular social group must be immutable, meaning it must be a characteristic "that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Id.* at 233.

At the time we decided *Matter of Acosta*, only 5 years had passed since enactment of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, and relatively few particular social group claims had been presented to the Board. As numerous and varied persecution claims were later asserted, we continued to refine the definition of a particular social group, including the concepts of particularity and social visibility. *See Orellana-Monson v. Holder*, 685 F.3d 511, 521 (5th Cir. 2012) (stating that the Board "may make adjustments to its definition of 'particular social group' and often does so in response to the changing claims of applicants").

We first enunciated the concepts of particularity and social visibility in *Matter of C-A-*, 23 I&N Dec. 951, 959–61 (BIA 2006), *aff'd sub nom. Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190 (11th Cir. 2006), *cert. denied*, 549 U.S. 1115 (2007). *See also Matter of A-M-E- & J-G-U-*, 24 I&N Dec. 69, 73–76 (BIA 2007), *aff'd sub nom. Ucelo-Gomez v. Mukasey*, 509 F.3d 70 (2d Cir. 2007). They were subsequently defined further in two companion cases relating to gang-based claims of persecution. *Matter of E-A-G-*, 24 I&N Dec. 591, 595–96 (BIA 2008); *Matter of S-E-G-*, 24 I&N Dec. 579, 582–88 (BIA 2008).

"Particularity" refers to whether the group is "sufficiently distinct" that it would constitute "a discrete class of persons." *Matter of S-E-G-*, 24 I&N Dec. at 584. The "social visibility" requirement mandates that "the shared characteristic of the group should generally be recognizable by others in the community." *Id.* at 586. Noting that the "concepts of 'particularity' and 'social visibility' give greater specificity to the definition of a social group," we held in *Matter of S-E-G-* that the definition of a particular social group "requires that the group have particular and well-defined boundaries, and that it possess a recognized level of social visibility." *Id.* at 582.

Our articulation of these requirements has been met with approval in the clear majority of the Federal courts of appeals. *See Umana-Ramos v. Holder*, 724 F.3d 667, 671 (6th Cir. 2013); *Henriquez-Rivas v. Holder*, 707 F.3d at 1087–91 (clarifying the criteria while reserving assessment of their validity); *Orellana-Monson v. Holder*, 685 F.3d at 521;

*Gaitan v. Holder*, 671 F.3d 678, 681 (8th Cir. 2012); *Zelaya v. Holder*, 668 F.3d 159, 165–66 & n.4 (4th Cir. 2012) (deferring to our particularity requirement); *Rivera-Barrientos v. Holder*, 666 F.3d 641, 649–53 (10th Cir. 2012); *Scatambuli v. Holder*, 558 F.3d 53, 59–61 (1st Cir. 2009); *Ucelo-Gomez v. Mukasey*, 509 F.3d at 74; *Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d at 1196–99. However, it has not been universally accepted. *See Valdiviezo-Galdamez v. Att'y Gen. of U.S.*, 663 F.3d 582, 603–09 (3d Cir. 2011) (holding that our adoption of the particularity and social visibility requirements is inconsistent with our prior decisions and that we did not articulate a principled reason for the departure); *Gatimi v. Holder*, 578 F.3d 611, 615–16 (7th Cir. 2009) (rejecting the social visibility requirement); *see also Cece v. Holder*, 733 F.3d 662, 668–69 & n.1 (7th Cir. 2013) (en banc).

The primary source of disagreement with, or confusion about, our interpretation of the term "particular social group" relates to the social visibility requirement. *See Umana-Ramos v. Holder*, 724 F.3d at 672–73; *Henriquez-Rivas v. Holder*, 707 F.3d at 1087. Contrary to our intent, the term "social visibility" has led some to believe that literal, that is, "ocular" or "on-sight," visibility is always required for a particular social group to be cognizable under the Act. *See Valdiviezo-Galdamez v. Att'y Gen. of U.S.*, 663 F.3d at 606.

The respondent urges us to reconsider our recent decisions regarding particularity and social visibility, arguing that they are inconsistent with our prior precedent and the standards of international refugee law. We disagree.

The well-known challenges in interpreting the term "particular social group" stem from its inherent ambiguity and the lack of supporting legislative history in international and domestic law. *See Sanchez-Trujillo v. INS*, 801 F.2d 1571, 1575–76 & n.5 (9th Cir. 1986); *Matter of Acosta*, 19 I&N Dec. at 232. Two principles of legislative interpretation have guided our analysis: (1) To the extent possible, the plain language of the term is applied, and (2) the term "particular social group" is construed consistently with the other protected grounds specified in the "refugee" definition in section 101(a)(42) of the Act, 8 U.S.C. § 1101(a)(42) (2012). *See Matter of Acosta*, 19 I&N Dec. at 233–34; *see also* United Nations Convention Relating to the Status of Refugees, art. 33, *adopted* July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 (entered into force Apr. 22, 1954), *available at* http://www.unhcr.org/3b66c2aa10.html.

By defining the requirements of particularity and social visibility in *Matter of C-A-* and the cases that followed it, we did not depart from or abrogate the definition of a particular social group that was set forth in *Matter of Acosta*; nor did we adopt a new approach to defining particular social groups under the Act. *See Henriquez-Rivas v. Holder*, 707 F.3d

at 1084 (describing our refinement of the definition of a particular social group). Instead, we clarified the definition of the term to give it more "concrete meaning through a process of case-by-case adjudication." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 448 (1987)) (internal quotation marks omitted); *see also Orellana-Monson v. Holder*, 685 F.3d at 521 (stating that "case-by-case adjudication is permissible and that such adjudication does not necessarily follow a straight path").

As the United States Court of Appeals for the Fifth Circuit has stated, "[T]he BIA's current particularity and social visibility test is not a radical departure from prior interpretation, but rather a subtle shift that evolved out of the BIA's prior decisions on similar cases and is a reasoned interpretation, which is therefore entitled to deference." *Orellana-Monson v. Holder*, 685 F.3d at 521; *see also Mendez-Barrera v. Holder*, 602 F.3d 21, 26 (1st Cir. 2010); *Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d at 1197 ("In [the] process of filling any *gap* left, implicitly or explicitly, by Congress, the courts must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program." (quoting *INS v. Cardoza-Fonseca*, 480 U.S. at 448 (internal quotation marks omitted))).

We adhere to our holdings that both particularity and social visibility are critical elements in determining whether a group is cognizable as a particular social group under the Act, but we now rename the "social visibility" element as "social distinction." By renaming this requirement, we intend to clarify that the criteria of particularity and social distinction are consistent with both the language of the Act and our earlier precedent decisions.[2]

## B. Immutable Characteristics

In *Acosta* we determined that any characteristic that defines a particular social group must be immutable, meaning it is one "that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Matter of Acosta*, 19 I&N Dec. at 233. The defining characteristic can be

---

[2] The Supreme Court has stated that administrative agencies may adopt a new or changed interpretation as long as it is based on a "reasoned explanation." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). Our decision in this case is not a new interpretation, but it further explains the importance of particularity and social distinction as part of the definition of the phrase "particular social group."

an innate characteristic or a shared past experience. The critical requirement is that the defining characteristic of the group must be something that either cannot be changed or that the group members should not be required to change in order to avoid persecution.

We held that the two characteristics defining the purported particular social group in that case—taxi drivers in San Salvador who refused to participate in guerrilla-sponsored work stoppages—were not immutable. We found they were not immutable because "the members of the group could avoid the threats of the guerrillas either by changing jobs or by cooperating in work stoppages." *Id.* at 234. The issue of immutability was dispositive. We therefore had no need to address other aspects of the proposed group and thus no need to discuss its particularity or its social distinction.

## C. Particularity

The term "particularity" is included in the plain language of the Act and is consistent with the specificity by which race, religion, nationality, and political opinion are commonly defined.[3] The Tenth Circuit recently noted that "the particularity requirement flows quite naturally from the language of the statute, which, of course, specifically refers to membership in a '*particular* social group.'" *Rivera-Barrientos v. Holder*, 666 F.3d at 649.[4] The particularity requirement also derives from the concept of immutability set forth in *Matter of Acosta*, clarifying the point, at least implicit in earlier case law, that not every immutable characteristic is sufficiently precise to define a particular social group. *See, e.g.*, *Escobar v. Gonzales*, 417 F.3d 363, 367–68 (3d Cir. 2005) (finding that the characteristics of poverty, homelessness, and youth are too vague and all-encompassing to set perimeters for a protected group within the scope of the Act). Clearly then, the requirement of "particularity" does not represent a significant departure from the language of the Act or our prior case law.

---

[3] However, there is a critical difference between a political opinion or religious belief, which may in theory be entirely personal and idiosyncratic, and membership in a particular social group, which requires that others in society share the characteristics that define the group.

[4] Although the Tenth Circuit affirmed the requirement of particularity, it disagreed with our conclusion that the petitioner's proposed group—young women, aged 12 to 25, who had resisted recruitment from criminal gangs—was not defined with sufficient particularity to meet the standard. *Rivera-Barrientos v. Holder*, 666 F.3d at 650. The court ultimately determined, however, that the proposed group lacked the requisite social visibility.

A particular social group must be defined by characteristics that provide a clear benchmark for determining who falls within the group. *Matter of A-M-E- & J-G-U-*, 24 I&N Dec. at 76 (holding that wealthy Guatemalans lack the requisite particularity to be a particular social group). It is critical that the terms used to describe the group have commonly accepted definitions in the society of which the group is a part. *Id.* (observing that the concept of wealth is too subjective to provide an adequate benchmark for defining a particular social group). The group must also be discrete and have definable boundaries—it must not be amorphous, overbroad, diffuse, or subjective. *See Ochoa v. Gonzales*, 406 F.3d 1166, 1170–71 (9th Cir. 2005) (stating that a particular social group must be narrowly defined and that major segments of the population will rarely, if ever, constitute a distinct social group).

Only the Third Circuit has rejected the particularity requirement, concluding that it was "hard-pressed to discern any difference between the requirement of 'particularity' and the discredited requirement of 'social visibility.'" *Valdiviezo-Galdamez v. Att'y Gen. of U.S.*, 663 F.3d at 608. However, we respectfully disagree with this concern for the reasons explained in *Matter of M-E-V-G-*, 26 I&N Dec. 227 (BIA 2014), which we decide today. We recognize that there is some overlap between the two requirements. This occurs because both "particularity" and "social visibility" take account of the societal context specific to the claim for relief. But they each emphasize different analytical aspects of a "particular social group," and it is necessary to address both elements to properly determine whether the group is cognizable under the Act.

"Particularity" chiefly addresses the question of delineation, or as earlier court decisions described it, the need to put "outer limits" on the definition of "particular social group." *See Castellano-Chacon v. INS*, 341 F.3d 533, 549 (6th Cir. 2003); *Sanchez-Trujillo v. INS*, 801 F.2d at 1576. The definition of a particular social group is not addressed in isolation, but rather in the context of the society out of which the claim for asylum arises. In assessing a claim, it may be necessary to take into account the social and cultural context of the alien's country of citizenship or nationality. This is why we require inquiry into whether the group can be described in sufficiently distinct terms that it "would be recognized, in the society in question, as a discrete class of persons." *Matter of S-E-G-*, 24 I&N Dec. at 584. In context, however, it is clear that the focus of the particularity requirement is whether the group is discrete or is, instead, amorphous. Societal considerations will necessarily play a factor in that determination. For example, a class of "landowners" in an underdeveloped, oligarchical society could be sufficiently discrete to meet the criterion of particularity.

In Canada or the United States, however, such a group would be far too amorphous to meet this requirement.

Persecutory conduct aimed at a social group cannot alone define the group, which must exist independently of the persecution. *See Matter of A-M-E- & J-G-U-*, 24 I&N Dec. at 74. Circuit courts have long recognized that a social group must have "defined boundaries" or a "limiting characteristic," other than the risk of being persecuted, in order to be recognized. *See, e.g.*, *Sanchez-Trujillo v. INS*, 801 F.2d at 1576–77 (finding that the proposed group of young, working class urban males of military age constitutes a "sweeping demographic division" manifesting a plethora of different lifestyles, interests, cultures, and political leanings and "is not that type of cohesive, homogenous group to which we believe the term 'particular social group' was intended to apply"); *Castellano-Chacon v. INS*, 341 F.3d at 548 (finding that the proposed group of "tattooed youth" falls outside the "outer limit" of the particular social group definition).[5]

## D. Social Distinction

Like particularity, the requirement of "social visibility" has roots in the earliest articulations defining the term "particular social group." For

---

[5] We agree with the Immigration Judge that, as a general rule in the Ninth Circuit, in whose jurisdiction this case arises, present or past experience in criminal activity cannot be the defining characteristic of a particular social group. *See Arteaga v. Mukasey*, 511 F.3d 940, 945–46 (9th Cir. 2007). Gang members willingly involved in violent, antisocial behavior are more akin to persecutors and criminals, who are barred from establishing eligibility for asylum and withholding of removal, than to refugees, whom the Act is intended to protect. And refugee protection is generally only provided to those whose government does not offer protection against serious harm inflicted on account of one of the five protected grounds. "Treating affiliation with a criminal organization as being protected membership in a social group is inconsistent with the principles underlying the bars to asylum and withholding of removal based on criminal behavior." *Matter of E-A-G-*, 24 I&N Dec. at 596. The Ninth Circuit explained in *Arteaga v. Mukasay*, 511 F.3d at 945–46, that gang membership, whether a present or a past shared experience, generally will not define a particular social group, because serious criminal activity is not the type of conduct normally protected as an immutable characteristic. Other circuits disagree as to whether former gang membership is an immutable characteristic. *Compare Cantarero v. Holder*, 734 F.3d 82, 85–86 (1st Cir. 2013) (holding that former gang membership is not an immutable characteristic), *with Martinez v. Holder*, No. 12-2424, 2014 WL 243293 (4th Cir. Jan. 23, 2014) (holding that former gang membership is an immutable characteristic), *Urbina-Mejia v. Holder*, 597 F.3d 360, 366 (6th Cir. 2010) (same), *and Benitez Ramos v. Holder*, 589 F.3d 426, 430 (7th Cir. 2009) (same).

example, in 1986 the Ninth Circuit stated that a persecutor's perception of a proposed social group is neither irrelevant nor conclusive in determining whether the group is "cognizable." *Sanchez-Trujillo v. INS*, 801 F.2d at 1576 n.7. Five years later, the Second Circuit was more explicit, holding that members of a social group must share a "fundamental characteristic" that is "recognizable and discrete" such that it "distinguish[es] them in the eyes" of others. *Gomez v. INS*, 947 F.2d 660, 664 (2d Cir. 1991). We later cited *Gomez* on this point in determining that, in Somali society, clan membership is a "highly recognizable" characteristic that is "inextricably linked to family ties." *Matter of H-*, 21 I&N Dec. 337, 342 (BIA 1996).

Our definition of "social visibility" clarified the importance of "perception" or "recognition" in the concept of the particular social group. The term was never meant to be read literally, but our use of the word "visibility" unintentionally promoted confusion. We now rename that requirement "social distinction" to clarify that social visibility does not mean "ocular" visibility—either of the group as a whole or of individuals within the group—any more than a person holding a protected religious or political belief must be "ocularly" visible to others in society. [6] *Henriquez-Rivas v. Holder*, 707 F.3d at 1087–89 (recognizing that social visibility means that members of the group would be perceived as a group by society).

Social distinction refers to recognition by society, taking as its basis the plain language of the Act—in this case, the word "social." To be socially distinct, a group need not be *seen* by society; it must instead be *perceived* as a group by society. *Matter of C-A-*, 23 I&N Dec. at 956–57 (citing guidelines adopted by the United Nations High Commissioner for Refugees ("UNHCR")). [7] Members of the group may be visibly recognizable, but

---

[6] In *Merriam-Webster's Collegiate Dictionary* 1316 (10th ed. 2002), the first definition of the word "visible" is "capable of being seen." While another definition is "capable of being discovered or perceived," *id.*, the word "visible" is often associated with ocular visibility, *see Black's Law Dictionary* 1602 (8th ed. 2004) (defining "visible" to mean "[p]erceptible to the eye; discernable by sight"). In contrast, the primary definition of "distinct" is "distinguishable to the eye or mind as discrete." *Merriam-Webster's Collegiate Dictionary*, *supra*, at 337. The word "distinct" better captures this element of the test because it includes both types of visibility: it encompasses not only whether the members of a group can be identified by sight but also how the group is perceived or recognized by others in society.

[7] In *Matter of C-A-*, 23 I&N Dec. at 960, we referred to groups being "highly visible" and described the group at issue—drug informants—as acting "out of the public view" and remaining "unknown and undiscovered." This language has been construed by some to require ocular visibility. We therefore clarify that we did not intend in *Matter of C-A-* to define "social visibility" in terms of ocular visibility.

society can also consider persons to be a group without being able to identify the members by sight.

In fact, for decades we have recognized particular social groups that are clearly not ocularly visible. *See, e.g.*, *Matter of Kasinga*, 21 I&N Dec. 357, 365–66 (BIA 1996) (determining that young tribal women who are opposed to female genital mutilation ("FGM") constitute a particular social group); *Matter of Toboso-Alfonso*, 20 I&N Dec. 819, 822–23 (BIA 1990) (holding that homosexuals in Cuba were shown to be a particular social group); *Matter of Fuentes*, 19 I&N Dec. 658, 662 (BIA 1988) (holding that former national police members could be a particular social group in certain circumstances). Our precedents have collectively focused on the extent to which the group is understood to exist as a recognized component of the society in question. *See Matter of E-A-G-*, 24 I&N Dec. at 594 (describing social visibility as "the extent to which members of a society perceive those with the characteristic in question as members of a social group").

To have the "social distinction" necessary to establish a particular social group, there must be evidence showing that society in general perceives, considers, or recognizes persons sharing the particular characteristic to be a group. Although the society in question need not be able to easily identify who is a member of the group, it must be commonly recognized that the shared characteristic is one that defines the group.

The examples of particular social groups in *Kasinga*, *Toboso-Alfonso*, and *Fuentes* illustrate this point. It may not be easy to identify who is opposed to FGM or who is homosexual or a former member of the national police. Such facts may take some effort to reveal. Nonetheless, it could still be easy for society to perceive such individuals as being a member of a particular group because of, for example, the sociopolitical conditions in the country. For this reason, the fact that members of a particular social group may make efforts to hide their membership to avoid persecution does not deprive the group of its protected status as a particular social group. *See Rivera-Barrientos v. Holder*, 666 F.3d at 652 (stating that the social distinction requirement "does not exclude groups whose members might have some measure of success in hiding their status in an attempt to escape persecution").

We also clarify that social distinction exists where the relevant society perceives, considers, or recognizes the group as a distinct social group. *See Henriquez-Rivas v. Holder*, 707 F.3d at 1089 ("Neither we nor the BIA has clearly specified whose perspectives are most indicative of society's perception of a particular social group . . . ."); *see also Rivera-Barrientos v. Holder*, 666 F.3d at 650–51 (referencing the relevant society as both "citizens of the applicant's country" and "the applicant's community").

Social distinction may therefore not be determined solely by the perception of an applicant's persecutors.

Defining a social group based on the perception of the persecutor is problematic for two significant reasons. First, it is important to distinguish between the inquiry into whether a group is a "particular social group" and the question whether a person is persecuted "on account of" membership in a particular social group. In other words, we must separate the assessment whether the applicant has established the existence of one of the enumerated grounds (religion, political opinion, race, ethnicity, and particular social group) from the issue of nexus. The structure of the Act supports preserving this distinction, which should not be blurred by defining a social group based solely on the perception of the persecutor.

Second, defining a particular social group from the perspective of the persecutor is in conflict with our prior holding that "a social group cannot be defined exclusively by the fact that its members have been subjected to harm." *Matter of A-M-E- & J-G-U-*, 24 I&N Dec. at 74. The perception of the applicant's persecutors may be relevant because it can be indicative of whether society views the group as distinct. But the persecutors' perception is not itself enough to make a group socially distinct. *Id.*

### E. Consistency with Prior Board Precedent

This articulation of the particularity and social distinction requirements is consistent with our prior decisions involving claims of persecution on account of membership in a particular social group. For example, in *Matter of V-T-S-*, 21 I&N Dec. 792, 798 (BIA 1997), we found "Filipino[s] of mixed Filipino-Chinese ancestry" to be a particular social group. This group had clear boundaries, and its characteristics had commonly accepted definitions. It therefore met the particularity requirement. The social distinction requirement was met since the evidence in that case showed that Filipino-Chinese were categorized as a group in background country information and that they were directly targeted for various types of mistreatment. *Id.* at 794–95, 798. These factors showed that members of the group were perceived as a distinct group in society.

In *Matter of Kasinga*, 21 I&N Dec. at 365, we found that "young women of the Tchamba-Kunsuntu Tribe who have not had FGM, as practiced by that tribe, and who oppose the practice" were a particular social group. This group had particularity because it was discrete, with definable boundaries. The group also had social distinction. The evidence established that women in the respondent's tribe were expected to undergo FGM prior to marriage. *Id.* at 360. As we noted, "FGM is practiced, at least in some significant part, to overcome sexual characteristics of young

women of the tribe" in order to assure male dominance. *Id.* at 366–67. Moreover, women who did not undergo FGM were socially ostracized. *Id.* at 361. These factors indicate that the tribe perceived young women who opposed and had not been subjected to FGM as a distinct group.

We also held in *Matter of H-*, 21 I&N Dec. at 343, that members of the "Marehan subclan" in Somalia were a particular social group. Because its members shared linguistic commonalities and kinship ties, that group was easily definable and therefore sufficiently particular. *Id.* The record also showed that the group had social distinction. The documentary evidence of country conditions described "the presence of distinct and recognizable clans and subclans in Somalia" and specified that the Marehan subclan was a small, once-privileged segment of the population. *Id.* We found that clan membership was "highly recognizable" and that the members were "identifiable as a group based upon linguistic commonalities." *Id.* at 342–43. These factors showed that the group was recognized in Somali society as a distinct group, giving it the requisite social distinction.

Similarly, we held that homosexuals in Cuba constituted a cognizable social group in *Matter of Toboso-Alfonso*, 20 I&N Dec. at 822. The group had sufficient particularity because it was discrete and readily definable. The evidence in that case also established social distinction. The Cuban Government classified homosexuals as a group and criminalized homosexuality. It also maintained files on them and required them to register and periodically appear for a hearing and physical exam. *Id.* at 820–21. The Union of Communist Youth held a protest against homosexuals. *Id.* at 821. For these reasons, it was apparent that Cuban society perceived homosexuals as a distinct group.

In *Matter of Fuentes*, 19 I&N Dec. at 662, we determined that "former member[s] of the national police" could be a particular social group. However, since we held that the respondent did not show that the harm he feared bore a nexus to his status as a former member of the national police, we did not fully assess the factors that underlie particularity and social distinction. With regard to particularity of the group, we now note that the respondent had served in the national police for 15 years during a period of civil conflict. *Id.* at 659. His service had ceased not long before he sought asylum. Therefore, at that time he would clearly have been considered a former member of the national police. A group of similarly situated former national police members could be considered a discrete group with defined boundaries. The length and recency of active membership in a group can be important factors in determining whether a group of "former" members is a social group with sufficiently discrete and definable boundaries to make it a *particular* social group.

Our holding in *Fuentes* that the group *could* be a cognizable particular social group was also informed by evidence showing that there was some societal perception of former national police officers as a distinct group, at least during the period of the civil strife from which the respondent was fleeing. The national police played a high-profile role in combating guerrilla violence. *Id.* at 661. A witness testified that "guerrillas had the names of the people who had been in the service" and targeted and killed former service members. *Id.* at 659. Thus, there was evidence of social distinction.

The respondent argues that our approach to defining a "particular social group" is inconsistent with international refugee standards. We acknowledged in *Matter of C-A-*, 23 I&N Dec. at 956, that our approach differs somewhat from guidelines adopted by the UNHCR for defining the term "particular social group." As we noted there, the UNHCR *Guidelines* define a "particular social group" as

> a group of persons who share a common characteristic other than their risk of being persecuted, *or* who are perceived as a group by society. The characteristic will often be one which is innate, unchangeable, or which is otherwise fundamental to identity, conscience or the exercise of one's human rights.

*Id.* (quoting UNHCR's *Guidelines* at ¶ 11) (emphasis added). The UNHCR's interpretations of principles related to refugee law "may be a useful interpretative aid, but [they are] not binding on the Attorney General, the BIA, or United States courts." *INS v. Aguirre-Aguirre*, 526 U.S. at 427.

Notably, our approach to defining a particular social group is similar to that adopted by the European Union, which also declines to follow the bifurcated definition set forth by the UNHCR. The European Union defines a particular social group as a group where:

> — members of that group share an innate characteristic, or a common background that cannot be changed, or share a characteristic or belief that is so fundamental to identity or conscience that a person should not be forced to renounce it, and

> — that group has a distinct identity in the relevant country, because it is perceived as being different by the surrounding society.

Directive 2011/95/EU, of the European Parliament and of the Council of 13 December 2011 on Standards for the Qualification of Third-Country Nationals or Stateless Persons as Beneficiaries of International Protection, for a Uniform Status for Refugees or for Persons Eligible for Subsidiary Protection, and for the Content of the Protection Granted (recast), art. 10,

2011 O.J. (L 337) 9, 16, *available at* http://www.refworld.org/cgi-bin/texis/vtx/rwmain?docid=4f197df02.  We therefore do not view our approach to defining a particular social group to be fundamentally different from international standards.

## IV.  RESPONDENT'S CLAIM FOR WITHHOLDING OF REMOVAL UNDER THE ACT

### A.  Particular Social Group

We agree with the Immigration Judge that the putative group of "former members of the Mara 18 gang in El Salvador who have renounced their gang membership" does not constitute a particular social group for purposes of establishing the respondent's eligibility for withholding of removal under the Act.  The group as defined lacks particularity because it is too diffuse, as well as being too broad and subjective.  *See Mayorga-Vidal v. Holder*, 675 F.3d 9, 15 (1st Cir. 2012) (stating that "loose descriptive phrases that are open-ended and that invite subjective interpretation are not sufficiently particular").  As described, the group could include persons of any age, sex, or background.  It is not limited to those who have had a meaningful involvement with the gang and would thus consider themselves—and be considered by others—as "former gang members."

For example, it could include a person who joined the gang many years ago at a young age but disavowed his membership shortly after initiation without having engaged in any criminal or other gang-related activities; it could also include a long-term, hardened gang member with an extensive criminal record who only recently left the gang.  It is doubtful that someone in the former category would consider himself, or be considered by others, as a "former gang member" or could be said to have any but the most peripheral connection to someone in the latter category.  Even if some in the former category might consider themselves "former gang members" in a general sense, this does not mean that they would perceive themselves as part of a discrete group within society or be so perceived.  The boundaries of a group are not sufficiently definable unless the members of society generally agree on who is included in the group, and evidence that the social group proposed by the respondent is recognized within the society is lacking in this case.

In this regard, the boundaries of the group of "former gang members who have renounced their gang membership" are not adequately defined.  The group would need further specificity to meet the particularity requirement.  Our analysis illustrates the point that when a former

association is the immutable characteristic that defines a proposed group, the group will often need to be further defined with respect to the duration or strength of the members' active participation in the activity and the recency of their active participation if it is to qualify as a particular social group under the Act.

The respondent also has not shown that his proposed social group meets the requirement of social distinction. The record contains scant evidence that Salvadoran society considers former gang members who have renounced their gang membership as a distinct social group. The record contains documentary evidence describing gangs, gang violence, and the treatment of gang members but very little documentation discussing the treatment or status of former gang members.

The only evidence of any societal view of former gang members is a report stating that there is a societal stigma against former gang members because of their tattoos, which makes it difficult for them to find employment. The International Human Rights Clinic, Human Rights Program, Harvard Law School, *No Place to Hide: Gang, State, and Clandestine Violence in El Salvador* 101 (2007). However, the report does not clarify whether such discrimination occurs because of their status as known former gang members or because their tattoos create doubts or confusion about whether they are, in fact, former, rather than active, gang members.

Other parts of the report also indicate that such discrimination and various forms of harassment are directed at a broader swath of young people who are, for one reason or another, suspected of being gang members, even if they have never had any affiliation with a gang. *Id.* at 84–95. This broader grouping suggests that former gang members are not considered to be a distinct group by Salvadorans.

The country reports do not address former gang members as a distinct group. *See* Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *El Salvador Country Reports on Human Rights Practices – 2008* (Feb. 25, 2009), *available at* http://www.state.gov/j/drl/rls/hrrpt/2008/wha /119159.htm. The only mention of former gang members is a prison population statistic that groups together gang members and former gang members.

For these reasons, we conclude the respondent has not provided evidence demonstrating that former Mara 18 gang members who have renounced their gang membership are perceived, considered, or recognized in Salvadoran society as a distinct group. Because the respondent has not shown membership in a cognizable social group, neither the harm he suffered nor the future harm he fears from gang members or the police on

account of his status as a former gang member provides a basis for withholding of removal under the Act.

The respondent also claims to fear persecution on account of his status as a deportee from the United States to El Salvador, which he asserts is another particular social group. Deportees are too broad and diverse a group to satisfy the particularity requirement for a particular social group under the Act. *See Delgado-Ortiz v. Holder*, 600 F.3d 1148, 1151–52 (9th Cir. 2010) (per curiam) (holding that "returning Mexicans from the United States" are "too broad" to qualify as a particular social group); *see also Lizama v. Holder*, 629 F.3d 440, 446–48 (4th Cir. 2011) (holding that "deportees with criminal histories" returning to El Salvador from the United States are "too broad" to constitute a particular social group). The respondent's purported social group could include men, women, and children of all ages. Their removal from the United States could be based on numerous different factors. The length of time they were in the United States, the recency of their removal, and societal views on how long a person is considered a deportee after repatriation could vary immensely. Because of these factors, deportees lack the particularity required to make them a cognizable social group.

## B. Nexus

Even if the respondent's purported social groups were cognizable under the Act, he has not demonstrated the required nexus between the harm he fears and his status as a former gang member. An applicant's burden includes demonstrating the existence of a cognizable particular social group, his membership in that particular social group, and a risk of persecution *on account of* his membership in the specified particular social group. *See Ayala v. Holder*, 640 F.3d 1095, 1097–98 (9th Cir. 2011) (affirming a finding that persecution was personally motivated, not on account of group membership, where a former military law enforcement officer was targeted for retribution by members of a gang whom he had previously arrested when he was in the military). Because the persecution of members of a particular social group can be a factor (but not the sole consideration) in determining whether the group is recognized as a distinct group within the relevant society, the question whether a cognizable social group exists may improperly be conflated with the question whether the feared harm would be inflicted on account of membership in that group.

While the views of the persecutor might play a role in causing members of society to view a particular group as distinct, the persecutor's views play a greater role in determining whether persecution is inflicted on account of the victim's membership in a particular social group. Whether that nexus

exists depends on the views and motives of the persecutor.  *See Matter of N-M-*, 25 I&N Dec. 526 (BIA 2011).  The respondent bears the burden of showing that his membership in a particular social group was or will be a central reason for his persecution.  Section 208(b)(1)(B)(i) of the Act, 8 U.S.C. § 1158(b)(1)(B)(i) (2012).  Thus, in this case, even if the respondent had demonstrated a cognizable particular social group, and his membership in it, he also must show that those he fears would harm him because he belongs to that social group.

The respondent has not shown that any acts of retribution or punishment by gang members would be motivated by his status as a former gang member, rather than by the gang members' desire to enforce their code of conduct and punish infidelity to the gang.  *See Matter of E-A-G-*, 24 I&N Dec. at 594 (noting that harm to a person who resisted gang recruitment "would arise from the individualized reaction of the gang to the specific behavior of the prospective recruit" and not from his general status as one who resisted recruitment).  Thus, even if the respondent were a member of a cognizable particular social group, the record does not show that the retributive harm the respondent fears would bear a nexus to his status as a former gang member, as opposed to his acts in leaving the gang. [8] We therefore find that the respondent did not establish eligibility for withholding of removal under the Act on this basis.

## V.  CONVENTION AGAINST TORTURE

We also conclude that the respondent did not meet his burden of proof to establish eligibility for withholding of removal under the Convention Against Torture.  The Ninth Circuit has held that the likelihood of torture is a question of fact that we review for clear error.  *Vitug v. Holder*, 723 F.3d 1056, 1063 (9th Cir. 2013); *Ridore v. Holder*, 696 F.3d 907, 915–16 (9th Cir. 2012).

The respondent was shot in the leg during one of two attacks he suffered when members of his former gang confronted him after he left the gang.  Acts of past torture must be considered when evaluating the likelihood of future torture.  8 C.F.R. § 1208.16(c)(3)(i) (2013).  However, the respondent has not established that it is more likely than not that gang

---

[8] Additionally, to be eligible for withholding of removal under the Act, the respondent would have to establish that the Salvadoran Government is unable or unwilling to control Mara 18 gang members.  *See Matter of Acosta*, 19 I&N Dec. at 222 (construing persecution as requiring that the claimed harm must be inflicted by the government of a country or by persons that the government is unable or unwilling to control).  The Immigration Judge did not make findings on this issue, so we do not reach it.

members would torture him if they encountered him now, more than 13 years after he left the gang, or even that they still remain involved in the gang. *See Canales-Vargas v. Gonzales*, 441 F.3d 739, 746 (9th Cir. 2006) (stating that the age of threats the applicant received are relevant to the reasonableness of the claimed fear). The respondent does not know of any explicit threat to him by gang members since he left El Salvador. The documentary evidence does not address how long retaliation may occur after one leaves a gang, and it does not show that the respondent would face torture.

The respondent had his gang tattoo removed and states that it is no longer visible. He is not being removed on criminal removal grounds. He has not shown, in light of these factors, why he believes he is likely to be identified as a former gang member by rival gangs, the police, or clandestine death squads. As the Immigration Judge found, the respondent presented no evidence that he has been charged with a crime or that the police have any interest in him. Even if the respondent were detained for questioning upon his removal, as he fears, he has not shown that it is more likely than not that he will be identified by authorities as a former gang member or, even if he is, that he will be tortured while detained. The record does not contain any evidence of deportees being detained by the Salvadoran Government and tortured upon their return to El Salvador.

The respondent also has not shown it is more likely than not that he will be imprisoned upon his return. Furthermore, even if he were, he has not shown that it is more likely than not that he will suffer torture stemming from poor prison conditions. Some documentation in the record describes poor conditions and gang violence in prisons, but it does not establish that mistreatment rising to the level of torture occurs with such frequency as to make it more likely than not that the respondent will be tortured if he is imprisoned. It also does not show that the Salvadoran Government would acquiesce in his torture in prison.

For these reasons, the Immigration Judge's predictive findings with respect to the respondent's torture claim are not clearly erroneous, and the respondent has not met his burden of proving the requisite likelihood of torture. *See Matter of J-F-F-*, 23 I&N Dec. 912, 917–18 & n.4 (A.G. 2006) (holding that each link in the hypothetical chain of events leading to the claim of likely torture must be established as more likely than not to occur); *Matter of M-B-A-*, 23 I&N Dec. 474, 479–80 (BIA 2002) (rejecting a claim based on "a chain of assumptions and a fear of what might happen, rather

than evidence that meets [the] burden of demonstrating that it is *more likely than not* that [the respondent] will be subjected to torture").[9]

The respondent also has not asserted that the Salvadoran Government was in any way involved in, or failed to respond to, the prior retaliatory harm he suffered by gang members. Withholding of removal under the Convention Against Torture requires a clear probability of torture "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1) (2013); *see also Zheng v. Ashcroft*, 332 F.3d 1186, 1196 (9th Cir. 2003) (defining acquiescence as willful blindness). The respondent has not met his burden of showing that the Government would acquiesce to the torture he fears from gang members in the future. *See Mayorga-Vidal v. Holder*, 675 F.3d 9, 20 (1st Cir. 2012) (affirming a determination that the applicant did not show that the Salvadoran Government would acquiesce to torture by gangs even though "El Salvador's efforts at managing gang activity have not been completely effectual").

Accordingly, the respondent's appeal will be dismissed.

**ORDER:** The appeal is dismissed.

---

[9] We do not agree with the respondent's characterization of the Immigration Judge's decision as holding that the respondent faces a danger of being killed but that death is not torture. The Immigration Judge noted that the record contained evidence of former gang members being killed upon their return to El Salvador, but he did not conclude that such killings are not torture. Rather, the Immigration Judge held that the evidence was not sufficient to show a clear probability that the respondent would be tortured.