In the

# United States Court of Appeals
## For the Seventh Circuit

No. 16-1534

EBER SALGADO GUTIERREZ,

*Petitioner*,

*v.*

LORETTA E. LYNCH,
Attorney General
of the United States,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A205-154-421

ARGUED AUGUST 9, 2016 — DECIDED AUGUST 24, 2016

Before BAUER, POSNER, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Eber Salgado Gutierrez, a 40-year-old citizen of Mexico, was ordered removed from the United States for being unlawfully present in the country and for having been convicted of a drug crime. He petitions for review of an order of the Board of Immigration Appeals upholding the immigration judge's denial of withholding of

removal (based on social-group membership) and relief under the Convention Against Torture. We have jurisdiction to review only two of his arguments: (1) his claim that the agency improperly rejected his proposed social group, and (2) his claim that the agency misapplied the legal standard under the CAT. Because these arguments are without merit, we dismiss in part and deny in part Salgado's petition for review.

## I. Background

Salgado unlawfully entered the United States in 1996 and lived in this country continuously for the next 20 years. In 2001 he met his current girlfriend, Mariela Rico Cuervas, also a Mexican citizen without lawful status in the United States. They have two children, a daughter born in 2001 and a son born in 2003—both U.S. citizens.

In 2005 Salgado was convicted in Wisconsin of possessing cocaine. *See* WIS. STAT. § 961.41(3g)(c). The Department of Homeland Security got wind of the drug conviction eight years later, in mid-2013, when Salgado was arrested for driving under the influence. The agency detained him in early 2014 and issued a Notice to Appear charging him with removability for having been convicted of a controlled-substance offense, 8 U.S.C. § 1182(a)(2)(A)(i)(II), and for being present in the United States unlawfully, *id.* § 1182(a)(6)(A)(i). Salgado admitted through his attorney that he was removable on both grounds and sought no relief from removal; the IJ ordered him removed to Mexico, but the Board of Immigration Appeals later remanded the case so that the immigration court could address Salgado's claim that his lawyer had provided ineffective assistance by neglecting to seek relief from removal. On remand the IJ

concluded that Salgado had been prejudiced by his first lawyer's ineffective assistance and permitted him to apply for relief.

Salgado applied for both statutory withholding of removal, *see id.* § 1231(b)(3)(A), and withholding under the Convention Against Torture, *see* 8 C.F.R. §§ 1208.16(c), 1208.18.[1] He argued that he has a well-founded fear of persecution on account of his membership in two social groups: (1) "Mexican nationals whose family members have suffered persecution at the hands of the Zetas and other drug cartels in Veracruz" and (2) "Mexican nationals who have lived in the U.S. for many years and who, upon being removed to Mexico, are perceived as having money." (Salgado also sought withholding of removal based on political opinion but has abandoned that argument.)

Salgado and his girlfriend testified at the removal hearing about why he feared returning to Mexico, and the IJ found them largely credible. They provided the following account: Before moving to the United States, Salgado lived with his parents in Tres Valles, a town in the Mexican state of Veracruz, and worked at the butcher shops owned by his father. The family closed the shops sometime after Salgado went to the United States because the Zetas, a Mexican drug cartel, extorted them and pressured all local businesses to sell drugs on the gang's behalf.

---

[1] Salgado also applied for asylum, but the IJ concluded (and the Board agreed) that his asylum application was untimely because he did not file it within a year of entering the United States and no changed or extraordinary circumstances excused the late filing. *See* 8 U.S.C. § 1158(a)(2)(B), (D); 8 C.F.R. § 1208.4(a)(2), (4), (5). Salgado has not pursued his asylum claim, so we do not discuss it further.

Salgado testified that three of his family members had been harmed by Mexican drug traffickers. In 1995, shortly before Salgado left Mexico, his cousin was killed by a local drug gang, purportedly for having witnessed a murder by members of the gang. Ten years later, when Salgado's half-brother was visiting Tres Valles from the United States, Zetas tried to kidnap him while he was walking down the street. The kidnapping was foiled when the brother resisted and witnesses called for help, but the Zetas beat him up before fleeing. Finally, one of Salgado's nephews was kidnapped in Tres Valles in 2014 and found alive three days later, having been left for dead. Salgado attributed the kidnapping to the Zetas.

Salgado said that he feared he would be kidnapped or even killed by the Zetas if he returned to Mexico. He testified that the Zetas identify people who have returned from the United States and target them for kidnapping. Three of Salgado's siblings still live in Tres Valles, and he maintained that they, too, would be endangered if he returned. Salgado also has two sisters who live elsewhere in Mexico—one in Mexico City, the other in the state of Oaxaca—but he stated that the Zetas would target him even if he relocated to those areas. Salgado insisted that he would not be safe *anywhere* in Mexico and that the Mexican authorities could not protect him from the Zetas.

In support of his claims for relief, Salgado also submitted documentary evidence, including (among other things) letters from family members and friends stating that he would be targeted by drug gangs in Mexico, especially if he returned to Tres Valles; newspaper articles describing the criminal activities of the Zetas (including murders of jour-

nalists and other citizens) in Tres Valles and the rest of Veracruz; and country-conditions reports chronicling violence by drug cartels across Mexico.

In a comprehensive 18-page opinion, the IJ concluded that Salgado was ineligible for both statutory withholding of removal and withholding under the CAT. The IJ began by finding that Salgado had not established past persecution. The IJ then determined that Salgado's proposed social group—"Mexican nationals who have lived for a long time in the United States and will be perceived as wealthy individuals by the Zetas upon return to Mexico"—was not cognizable because "wealth alone is not an immutable characteristic." Even if this social group were cognizable, the IJ continued, Salgado did not have a well-founded fear of persecution because the country-conditions documents "do not show that drug cartels or organized criminal groups in Mexico have specifically targeted Mexican citizens returning from the United States because of their perceived wealth."

Likewise, the IJ stated, there was no evidence that the Zetas would target Salgado because of his family ties. The IJ acknowledged that there was pervasive violence by drug cartels in Mexico and that Salgado had a *subjective* fear that the Zetas would harm him. But the "general civil strife" in Mexico did not constitute persecution, the IJ reasoned, and moreover, Salgado's "fear of future persecution [was] speculative and based on conjecture."

The IJ added that even if Salgado had established that he would face persecution on account of a protected status, he nonetheless was ineligible for withholding because he had not met his burden of establishing that he could not reasonably relocate to another part of Mexico to avoid persecution.

Finally, the IJ concluded that Salgado was ineligible for CAT relief because his fear of being harmed by the Zetas with the acquiescence of government officials was only speculative.

The Board upheld the IJ's decision, echoing much of the IJ's reasoning and concluding that the IJ's findings were not clearly erroneous. The Board added that to the extent that Salgado feared persecution "on account of having lived in the United States for many years," he was ineligible for withholding because "deportees are too broad and diverse" to qualify as a particular social group. The Board also agreed with the IJ's denial of Salgado's claim for CAT relief. The Board acknowledged our recent holdings that the proper inquiry in CAT cases is whether the alien faces a substantial risk of torture if removed, *see Rodriguez-Molinero v. Lynch*, 808 F.3d 1134, 1135–36 (7th Cir. 2015), and that the government-acquiescence standard is satisfied by showing that a local, state, or federal public official would acquiesce in torture or that the government is unsuccessfully trying to prevent torture by police officers working for drug gangs, *id.* at 1139; *Mendoza-Sanchez v. Lynch*, 808 F.3d 1182, 1184–85 (7th Cir. 2015). But those decisions did not help Salgado, the Board reasoned, because unlike the petitioners in those cases, Salgado had "not been tortured, harmed, threatened, or even inquired after by gang members." Moreover, the Board noted that the "random incidents of violence against family members which happened years apart" were unconnected to Salgado, so the IJ did not clearly err by finding that the threat of harm to him was speculative.

Salgado petitioned for review and moved for a stay of removal. A motions panel denied the stay, and Salgado was removed to Mexico in early May 2016. At the time of his

removal, he had been detained by the Department of Homeland Security for a little over two years.

## II. Analysis

We begin our analysis by noting that we lack jurisdiction to consider several of Salgado's arguments because 8 U.S.C. § 1252(a)(2)(C) generally bars judicial review of final orders of removal for aliens who, like Salgado, are removable under § 1182(a)(2) for having been convicted of a controlled-substance offense.[2] *See Isunza v. Lynch*, 809 F.3d 971, 973 (7th Cir. 2016); *Guevara v. Gonzales*, 472 F.3d 972, 974 (7th Cir. 2007). Although we retain jurisdiction to review questions of law and constitutional claims, *see* 8 U.S.C. § 1252(a)(2)(D); *Isunza*, 809 F.3d at 973, most of Salgado's arguments do not meet this standard. Salgado argues that the Board erred in finding (1) that his fear of future persecution was not well-founded; (2) that he could reasonably relocate within Mexico; and (3) that he does not face a substantial risk of being tortured by or with the acquiescence of government officials in Mexico. These are not questions of law; Salgado simply disagrees with the weight that the agency assigned to particular evidence. *See Kiorkis v. Holder*, 634 F.3d 924, 929 (7th Cir. 2011); *Chavez-Vasquez v. Mukasey*,

---

[2] Salgado was ineligible to apply for deferral of removal under the CAT—the denial of which we would retain jurisdiction to review, *see Moral-Salazar v. Holder*, 708 F.3d 957, 962 (7th Cir. 2013); *Wanjiru v. Holder*, 705 F.3d 258, 263–65 (7th Cir. 2013)—because that form of relief is available only to certain persons who, unlike Salgado, are barred from withholding due to a conviction for a particularly serious crime and other crimes not relevant here, *see* 8 C.F.R. §§ 1208.17(a), 1208.16(d)(2) & (3).

548 F.3d 1115, 1119 (7th Cir. 2008); *Adebowale v. Mukasey*, 546 F.3d 893, 896 (7th Cir. 2008).

Salgado attempts to get around the jurisdictional bar by recasting his objections to the agency's factual findings as legal errors. He asserts, for instance, that the Board "ignored" and "did not fully consider" the evidence, *see Jawad v. Holder*, 686 F.3d 400, 403–04 (7th Cir. 2012) (recognizing that a claim that the agency ignored evidence is a claim of legal error). We reject this attempt to manufacture a legal issue because the record reveals that the IJ thoroughly considered Salgado's evidence before concluding that he was ineligible for relief. *See id.* at 404; *Chavez-Vasquez*, 548 F.3d at 1119. And because the IJ's discussion of the evidence was comprehensive, Salgado's argument that the *Board* did not mention every piece of evidence misses the mark. Where, as here, the Board agrees with the IJ but adds observations of its own, we review the IJ's decision as supplemented by the Board's opinion. *See Wang v. Holder*, 759 F.3d 670, 673 (7th Cir. 2014); *Cordova-Soto v. Holder*, 732 F.3d 789, 793 (7th Cir. 2013); *Sarhan v. Holder*, 658 F.3d 649, 653 (7th Cir. 2011); *Borovsky v. Holder*, 612 F.3d 917, 920 (7th Cir. 2010).

Salgado raises two arguments that we do have jurisdiction to consider, but both lack merit. First, he maintains that the Board applied the wrong legal standard when it concluded that one of his proposed social groups—Mexican nationals who have lived in the U.S. for many years and are perceived as wealthy upon returning to Mexico—is not cognizable.[3] Specifically, he challenges the Board's conclu-

---

[3] Salgado has abandoned his claim that he faces persecution because he belongs to the social group of "Mexican nationals whose family members

sion that to the extent he feared persecution "on account of having lived in the United States for many years," he was ineligible for withholding because "deportees are too broad and diverse" to qualify as a particular social group under the Board's decision in *In re W-G-R-*, 26 I. & N. Dec. 208 (BIA 2014). Relatedly, he contends that the Board mischaracterized his proposed social group "by referring to only half of its attributes"—namely, the attribute of having lived in the United States but not the attribute of being perceived as wealthy.

Salgado is correct that the Board wrongly rejected his proposed social group simply because it is too broad and diverse; we have "specifically rejected 'broadness' as a per se bar to protected status." *N.L.A. v. Holder*, 744 F.3d 425, 438 (7th Cir. 2014); *see Cece v. Holder*, 733 F.3d 662, 674 (7th Cir. 2013) (en banc). But this error doesn't help Salgado because even if his proposed social group were cognizable, he would not be entitled to relief given the agency's finding that he could avoid harm by relocating to another part of Mexico. *See Kaharudin v. Gonzales*, 500 F.3d 619, 624 (7th Cir. 2007); 8 C.F.R. § 1208.16(b)(2), (b)(3)(i). Because the agency's determination about relocation is a factual finding that does not present a legal question, § 1252(a)(2)(C) bars judicial review of the agency's conclusion. *See Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 806 n.12 (11th Cir. 2016).

The other problem with Salgado's challenge is that we recently declined to recognize a social group nearly identical

---

have suffered persecution at the hands of the Zetas and other drug cartels in Veracruz." He does not mention this proposed social group anywhere in his brief.

to the one he proffers. In *Dominguez-Pulido v. Lynch*, the petitioner proposed a social group "made up of individuals deported from the United States who have money or who are perceived to have money, and who have family members in the United States who could pay ransom." 821 F.3d 837, 844–45 (7th Cir. 2016). We concluded that this group is not cognizable for purposes of asylum and statutory withholding of removal "because its primary characteristic is wealth or perceived wealth, specifically the ability to pay a ransom," and further that the petitioner's "attempt to narrow his proposed group by adding the trait of 'being deported from the U.S.' does not render his group cognizable." *Id.* at 845 (citing *Tapiero de Orejuela v. Gonzales,* 423 F.3d 666, 672 (7th Cir. 2005); *In re W-R-G-*, 26 I. & N. Dec. at 223).

Salgado does not attempt to distinguish *Dominguez-Pulido*, nor does he argue that it was wrongly decided and should be revisited; instead, he contends in his reply brief that the *Chenery* doctrine bars the government from relying on *Dominguez-Pulido* because "the agency did not consider or rely upon it." That argument misapprehends *Chenery*, which prohibits defending an administrative decision on a new ground not set forth in the agency's original decision. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *see Lara v. Lynch*, 789 F.3d 800, 805–06 (7th Cir. 2015). There is no *Chenery* violation here because by citing *Dominguez-Pulido*, the government is not relying on a new ground but rather providing additional legal authority to support the Board's conclusion that Salgado is ineligible for withholding of removal because his proposed social group is not cognizable.

Finally, turning to the denial of his request for CAT relief, Salgado argues that the Board failed to apply *Rodri-*

*guez-Molinero v. Holder*, in which we clarified that the "more likely than not" standard articulated in many CAT opinions "cannot be and is not taken literally" to the extent that it suggests attaching a numerical probability to the likelihood of torture; the proper inquiry is simply whether "there is, or is not, a substantial risk that a given alien will be tortured if removed from the United States." 808 F.3d at 1135–36. He maintains that the Board should have granted CAT relief based on his documentary evidence about the Zetas and this court's statements in *Rodriguez-Molinero* regarding the inability of the Mexican government to control the Zetas— statements that he says are "binding in [his] case."

This argument lacks merit for two reasons. First, there is no indication that the Board misapplied the legal standard for CAT relief. The Board set out the correct legal standard, quoting the standard we articulated in *Rodriguez-Molinero*. But the Board then distinguished Salgado's circumstances from those of the petitioners in *Rodriguez-Molinero* and *Mendoza-Sanchez v. Lynch*: Unlike the petitioners in those cases, Salgado "has not been tortured, harmed, threatened, or even inquired after by gang members." Instead, the Board stated, Salgado's evidence consisted of "random incidents of violence against family members which happened years apart and are unrelated and not connected in any way to the respondent." No step of the Board's analysis suggests that it misunderstood or misapplied the legal standard for obtaining CAT relief. Second, our statements in *Rodriguez-Molinero* about the Mexican government's inability to control the Zetas do not establish that the Zetas are likely to single out Salgado for torture if he returns to Mexico. *See Lenjinac v. Holder*, 780 F.3d 852, 856 (7th Cir. 2015).

Accordingly, Salgado's petition for review is DISMISSED in part and DENIED in part.

POSNER, *Circuit Judge, concurring*. I agree with the panel's conclusion that the petitioner is not entitled to relief because, deported to Mexico in May of this year and residing in Veracruz, where members of his extended family live—but which is also where the fearsome Mexican drug gang known as the Zetas is centered—he's failed to make any showing that he can't relocate from Veracruz to some place in Mexico in which he won't be persecuted either by the Zetas or by some other gang. In addition he's failed to show that in Veracruz or elsewhere the Zetas have targeted his family or him. (Compare *Mendoza-Sanchez v. Lynch*, 808 F.3d 1182, 1183 (7th Cir. 2015) (petitioner had snitched on La Linea, another powerful Mexican drug gang); *Rodriguez-Molinero v. Lynch*, 808 F.3d 1134, 1136–37 (7th Cir. 2015) (petitioner owed the Zetas $30,000).) Members of his family have it is true had violent, in one instance fatal, encounters with Zetas, but for reasons that don't appear to have been related to their family membership or identity. The Board of Immigration Appeals described these encounters as "random incidents of violence against family members which happened years apart" and were not connected to the petitioner, and the petitioner has failed to rebut this assessment.

The petitioner *might* find it difficult to relocate even to a part of Mexico where, unlike Veracruz where he currently resides, the Zetas are as yet inactive; for wherever he relocates in Mexico he is bound to be asked questions about his origin, and his 20 years of living in the United States may make him recognizable as an alien and prevent his obtaining employment. But he doesn't argue that, and I write separately only to address a proposition in the immigration court's opinion (and echoed I regret to say in opinions of this

court) that seems to me palpably false, though not determinative in this case.

The proposition is that the status of being a member of a group made up of individuals deported from the United States who, having lived in this country for many years, either have money or are believed to have money and have long-established ties to this country, and who for any of these reasons might be able to pay ransom, nevertheless can't be deemed members of a "social group" authorized to obtain relief from deportation because of threats to the life or safety of the group's members. The ground on which the immigration court rejected wealth as a characteristic that can define a social group is that wealth is not an "immutable characteristic." "[T]he phrase 'persecution on account of membership in a particular social group' [has been] interpreted to mean 'persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic.'" *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 230–31 (BIA 2014). "The common characteristic that defines the group must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Id.* at 231. And a group consisting of people whose "primary characteristic is wealth or perceived wealth, specifically the ability to pay a ransom" does not qualify because "wealth, standing alone, is not an immutable characteristic of a cognizable social group." *Dominguez-Pulido v. Lynch*, 821 F.3d 837, 844–45 (7th Cir. 2016).

That is a mistake, for a variety of reasons, one being that wealth doesn't stand alone in the definition of the social group urged by the petitioner; it must be wealth available

for payment of a ransom. But a more serious mistake was the invocation of "immutability" as a touchstone of eligibility for being a member of a "social group." Very few characteristics of a group or individual are immutable any more. For example, modern medical techniques enable people to change their sex, though doubtless sex is one of the mutable characteristics that the Board of Immigration Appeals would concede that a person "should not be required to change" as a condition of avoiding persecution. But getting back to wealth, I note that wealth does not often "stand alone" in these cases. In *Tapiero de Orejuela v. Gonzalez*, 423 F.3d 666, 672 (7th Cir. 2005), we said that Colombian cattle farmers were not defined merely by their wealth but also by their land, their profession, and their education. And similarly Salgado-Gutierrez is defined by his having lived in the United States for twenty years—for being, as a consequence, to a degree American—a fact of his personal history that he can't escape from.

Furthermore, having or being thought to have wealth is in an important *practical* sense "immutable." Suppose a person facing deportation from the United States gives away all his money and arrives in his country of origin, which in this case is Mexico, penniless. The Zetas seize him and demand money. He explains that he has none. Are the Zetas likely to leave him alone? No, they're likely to torture him, and if unable by that route to extract any money from him they are very likely to kill him.

Suppose finally that a deportee is the only wealthy person from the country to which he is to be deported. He thus is not a member of the social group to which the petitioner in this case belongs, and suppose he's not a member of any other social group either. Does that mean he

can't avoid deportation even if he proves that he's certain to be persecuted if deported? That would be ridiculous, though it is the implication of the statute, 8 U.S.C. § 1231(b)(3)(A), that ties deferral or cancellation of deportation to membership in a social group, and of the BIA decisions approvingly cited in the majority opinion in the present case.