[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10985

_____

Agency No. A206-918-567

ZURY ALVIZURIZ-LORENZO,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(October 28, 2019)

Before WILSON and NEWSOM, Circuit Judges, and PROCTOR,[*] District Judge.

PROCTOR, District Judge:

---

[*] Honorable R. David Proctor, District Judge for the United States District Court for the Northern District of Alabama, sitting by designation.

Zury Alvizuriz-Lorenzo, a native and citizen of Guatemala, petitions for review of a final order of the Board of Immigration Appeals (BIA), which affirmed the decision of the Immigration Judge (IJ) denying asylum. The BIA and IJ denied Alvizuriz-Lorenzo's claims because she failed to prove that her two proposed social groups—"girls or young women in Guatemala who cannot leave their family as a result of their age or economic conditions"  or "girls or young women who cannot leave their family"—were cognizable for the purposes of asylum.

After careful consideration, and particularly in light of the standard of review applicable here, we deny the petition.

## I.    Background

Alvizuriz-Lorenzo entered the United States without inspection in 2015 through Laredo, Texas.  She boarded a Florida-bound bus, but Immigration officers from the Department of Homeland Security (DHS) stopped the bus and took her into custody.

DHS commenced removal proceedings and issued a Notice to Appear, which charged Alvizuriz-Lorenzo with being removable under § 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA"). 8 U.S.C. § 1182(a)(6)(A)(i). Alvizuriz-Lorenzo conceded removability as charged.  However, to avoid removal, Alvizuriz-Lorenzo applied for asylum. She asserted that she suffered and feared persecution on account of her membership in a particular social group.  She did not

initially specify a particular social group in her application.

At her merits hearing, Alvizuriz-Lorenzo sought asylum based on her membership in a particular social group consisting of "girls or young women in Guatemala who cannot leave their family as a result of their age or economic conditions." Alternatively, Alvizuriz-Lorenzo has defined her particular social group as "girls or young women in Guatemala who cannot leave their family." Although not mentioned in her application, at the hearing Alvizuriz-Lorenzo testified in detail about the abhorrent events that led to her fleeing Guatemala to seek refuge in the United States.

Beginning at age nine, Alvizuriz-Lorenzo was sexually abused by her grandfather. She explained that her grandfather sexually abused her on a weekly basis until she was thirteen. She provided the IJ with specifics about the reprehensible misconduct of her grandfather. It was detestable. The grandfather's repeated sexual abuse ceased when Alvizuriz-Lorenzo's older brother, Luis Miguel, caught him in the act. Luis Miguel informed their grandmother of her husband's sexual abuse of Alvizuriz-Lorenzo. The grandmother confronted her husband and, after engaging in a verbal confrontation with him, suffered a stroke. She died less than a year later. Although the grandfather stopped sexually assaulting Alvizuriz-Lorenzo, he continued to psychologically abuse her by blaming her for his wife's death. Alvizuriz-Lorenzo testified that her family did not

3

report the grandfather's abuse because Guatemalan police "[don't] do anything in regards to these things." When asked why she did not include claims that her grandfather sexually abused her in her application, she explained that she was embarrassed and, initially, was afraid to divulge the information.

Alvizuriz-Lorenzo further testified that, although her grandfather never touched her again, her father, who was absent from the household for several years, returned when she was sixteen years old and sexually abused her over the next five years. At first, Alvizuriz-Lorenzo became very close to her father. She had missed him while he was away. But her father soon began to question her about the grandfather's acts. The father told Alvizuriz-Lorenzo that he wanted to know whether she was still a virgin. He then began molesting her. Within a year of his return, he forced Alvizuriz-Lorenzo to have sexual relations with him. This incestual sexual abuse continued until Alvizuriz-Lorenzo was twenty-one, when her older brother walked in on the father raping her. After being discovered, her father never touched her again. She did not inform her mother of the abuse until the day of the merits hearing. Alvizuriz-Lorenzo stated the abuse was not reported because the Guatemalan police would consider it a "waste of time."

On cross-examination, Alvizuriz-Lorenzo acknowledged that there were prisons in Guatemala but she stated that authorities did not incarcerate rapists because rape was "not something [that] the police investigate when it happens to

4

women there." Alvizuriz-Lorenzo submitted three reports on the conditions in Guatemala: (1) a 2015 Human Rights Report for Guatemala; (2) the 2015/2016 Amnesty International Annual Report for Guatemala; and (3) a 2014 Human Rights Watch Report on Guatemala. She also submitted two articles that emphasize the pervasive nature of violence against women in Guatemala.

At the end of the merits hearing, the IJ issued a decision denying Alvizuriz-Lorenzo's application for asylum, finding that she was removable.[1] In particular, the IJ found Alvizuriz-Lorenzo credible and determined that her sexual abuse and experiences rose to the level of past persecution under applicable regulations. However, the IJ concluded that Alvizuriz-Lorenzo was not persecuted on account of a protected ground because her proposed social group was "not a cognizable particular social group for purposes of asylum." Although the proposed group may have satisfied the "immutability" requirement, the IJ reasoned, it did not satisfy the

---

[1] Additionally, Alvizuriz-Lorenzo indicated during the proceedings before the IJ that she was raped and impregnated by her cousin's husband. However, as Alvizuriz-Lorenzo stated in the IJ proceedings, and again in her appeal to the BIA, her proposed particular social group solely relates to abuse inflicted by her father and grandfather. A.R. at 4. In fact, before the IJ, her counsel argued that the abuse at the hands of her cousin's husband was "because of her religious beliefs," since Alvizuriz-Lorenzo also applied for asylum based on past persecution for her religious views. A.R. at 98. The IJ ultimately decided that the abuse suffered by Alvizuriz-Lorenzo was not inflicted on account of her religion—a decision that she does not challenge here. A.R. at 107. Because Alvizuriz-Lorenzo has not argued on appeal that the rape by her cousin's husband is relevant to her proposed social group, the argument is considered waived. *See Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1256 n.6 (11th Cir. 2006) (explaining issues not argued in opening brief are waived). We note further that the IJ and BIA denied Alvizuriz-Lorenzo's request for protection under the United Nations Convention Against Torture (CAT)—another decision that she does not challenge here. A.R. at 5.

5

"particularity" or "social distinction" requirements.

On appeal, the BIA affirmed the denial of Alvizuriz-Lorenzo's application for asylum. By a 2-1 vote, the panel agreed with the IJ's finding that the past mistreatment of Alvizuriz-Lorenzo rose to the level of past persecution, but also agreed that she had not been persecuted on account of a particular social group comprised of "girls or young women in Guatemala who cannot leave their family as a result of their age or economic conditions." The BIA agreed with the IJ that such a group lacked social distinction. The third panel member issued a concurring and dissenting opinion, agreeing that Alvizuriz-Lorenzo had not established eligibility for asylum based on her religion, but disagreeing with the majority that the particular social group at issue was not cognizable.[2]

---

[2] Specifically, the third panel member disagreed with the majority's analysis of the particularity and the social distinction prongs. In her analysis, the third panel member applied *de novo* review to the IJ's legal and factual findings with respect to particularity and social distinction. Regarding particularity, the third panel member found the terms defining Alvizuriz-Lorenzo's groups—"girls," "young women," "family," and "unable to leave"—to have commonly accepted definitions within Guatemalan society and, as such, concluded Alvizuriz-Lorenzo's groups were particularly defined. Moreover, the third panel member determined that, when considering *Matter of A-R-C-G-*, Alvizuriz-Lorenzo's proposed groups were socially distinct. Thus, the third panel member would have dismissed Alvizuriz-Lorenzo's appeal in part, sustained it in part, and remanded the case for the IJ to determine whether her father and grandfather harmed her on account of her membership in her proposed social groups. We find it significant that the third panel member purported to apply "de novo review" when determining that she would reverse the IJ's determination, rather than the clear error standard applicable to the IJ's fact finding. *See* A.R. at 7–8. We acknowledge that this is the type of case that tempts a reviewing judge to substitute her opinion for those of the trier of fact. Even the IJ stated, "[t]he [c]ourt wishes that asylum law was such that [it could] grant relief to someone in [Alvizuriz-Lorenzo's] situation." A.R. at 109. But she also acknowledged "the [c]ourt must apply the law to the facts of the [] case." *Id.* As the IJ concluded, the result was driven by the fact that the law is not on Alvizuriz-Lorenzo's side. *Id.* We also sympathize with Alvizuriz-Lorenzo. Nevertheless, we are bound to apply the substantial evidence standard of review on this appeal.

Alvizuriz-Lorenzo now petitions us for review.

## II.    Standard of Review

We review the BIA's legal conclusions *de novo*, including whether an alleged group qualifies as a "particular social group" under the INA. *Gonzales v. U.S. Att'y Gen.,* 820 F.3d 399, 403 (11th Cir. 2016). Factual determinations, in contrast, are reviewed according to the substantial evidence standard, which requires us to view the record in the light most favorable to the agency's decision and draw all reasonable inferences in its favor. *Adefemi v. Ashcroft,* 386 F.3d 1022, 1026–27 (11th Cir. 2004) (en banc).

The particular social group inquiry is a "mixed question of law and fact." That means we review *de novo* the ultimate legal conclusion as to the existence of a particular social group, but review the underlying factual findings for substantial evidence. *See Matter of W-G-R-*, 26 I. & N. Dec. 208, 209–10 (BIA 2014), *vacated in part on other grounds by Reyes v. Lynch*, 842 F.3d 1125 (9th Cir. 2016) ("While the analysis of a particular social group claim is based on the evidence presented and is often a fact-specific inquiry, the ultimate determination whether a particular social group has been established is a question of law."). The standard of review is critical in this appeal. Therefore, we address it in detail.

We will "affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Sanchez*

7

*Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1230 (11th Cir. 2007). This is a deferential standard. In fact, we will only reverse the IJ's decision on a fact question if we find that the record compels, not merely supports, reversal. *Id.*

An applicant for asylum must meet the INA's definition of a refugee. 8 U.S.C. § 1158(b)(1). The definition of a "refugee" includes:

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail . . . herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of . . . membership in a particular social group.

8 U.S.C. § 1101(a)(42)(A). In order to meet the definition of a refugee, the applicant must demonstrate either: (1) "past persecution on account of a statutorily listed factor," or (2) "a well-founded fear the statutorily listed factor will cause" further persecution. *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1257 (11th Cir. 2006).

We have held "the BIA's interpretation of the phrase 'particular social group' . . . is entitled to *Chevron*[3] deference because the [Act] does not define the phrase and it is ambiguous." *Gonzalez*, 820 F.3d at 404 (citing *Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190, 1196 (11th Cir. 2006)). We defer to the BIA's interpretation of what constitutes a particular group under the INA unless the interpretation is unreasonable, arbitrary, capricious, or clearly contrary to law.

---

[3] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

8

*Castillo-Arias*, 446 F.3d at 1196. The BIA has clarified that "membership in a particular social group" requires an applicant for asylum to establish the group is "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 251–52 (BIA 2014); *see also Gonzalez*, 820 F.3d at 404.  A social "group's recognition for asylum purposes is determined by the perception of the society in question, rather than by the perception of the persecutor." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 242.

III.    **Analysis**

In reviewing this petition, we analyze each of the elements identified by the BIA, in turn. After doing so, we conclude the petition is due to be denied.

### a.  Immutability

An immutable characteristic is one "that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985), *overruled on other grounds by Matter of Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987).  The BIA has provided a non-exhaustive list of immutable characteristics, including "sex, color, or kinship ties, or in some circumstances . . . a shared past experience such as former military leadership or land ownership." *Id.*

The IJ and BIA both noted that Alvizuriz-Lorenzo's proposed particular

social group of "girls or young women in Guatemala who cannot leave their family as a result of their age or economic conditions" likely satisfies the immutability requirement. Because Alvizuriz-Lorenzo's proposed social group is comprised of members who share a common immutable characteristic of gender ("girls or young women") and kinship ties ("who cannot leave their family"), we conclude she has satisfied the immutability requirement. *See Gebremichael v. I.N.S.*, 10 F.3d 28, 36 (1st Cir. 1993) ("There can, in fact, be no plainer example of a social group based on common, identifiable and immutable characteristics than that of the nuclear family.").

### b. Particularity

"A particular social group must be defined by characteristics that provide a clear benchmark for determining who falls within the group." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 239. The terms used to describe the proposed social group must have commonly accepted definitions in the society in question. *Id.*; *see also Matter of A-M-E & J-G-U-*, 24 I. & N. Dec. 69, 76 (BIA 2007). The "group must also be discrete and have definable boundaries—it must not be amorphous, overbroad, diffuse, or subjective." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 239.

The IJ found, and the BIA affirmed, that Alvizuriz-Lorenzo's particular social group "lack[ed] the clear boundaries" to be sufficiently particular, and that "[t]here is no evidence" to the effect that her particular group was viewed as such

10

by Guatemalan society. *See id.* at 239–40 (finding the particularity requirements relate to the group's boundaries or the need to put outer limits on the definition of the particular social group, stating that the "social group must be defined by characteristics that provide a clear benchmark for determining who falls within the group"). The BIA stated "while we recognize that [Alvizuriz-Lorenzo] has presented country conditions reports evidencing general violence against women and corruption among authorities in Guatemala not specific to her, the Immigration Judge did not clearly err . . . ." A.R. at 5.

Although Alvizuriz-Lorenzo put forward evidence of widespread violence against girls or young women in Guatemala, this does not compel the conclusion that her proposed social group is defined with particularity. The evidence presented by Alvizuriz-Lorenzo also shows that the group is quite immense, somewhat diffuse, and comprises a high percentage of Guatemalan women. The IJ found that the group, as articulated by Alvizuriz-Lorenzo, "lacks the clear boundaries" necessary to provide a discernable benchmark for determining who falls within the group. A.R. at 106. We recognize that, in this case, the particularity prong is a close call. But, after careful consideration, and applying the substantial evidence standard, we cannot say the record *compels* reversal. *Mendoza v. U.S. Att'y Gen.*, 327 F.3d 1283 1287 (11th Cir. 2003) (finding that in order to reverse a factual determination, the court must conclude "that the record not only supports reversal,

11

but *compels* it" (emphasis added)).

### c. Social Distinction

In addition to immutability and particularity, an applicant for asylum must show that her particular social group is "socially distinct within the society in question." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 252. Social distinction is a fact-based inquiry. *See Pirir-Boc v. Holder*, 750 F.3d 1077, 1083–84 (9th Cir. 2014) (describing a "required evidence-based inquiry as to whether the relevant society recognizes [a] proposed social group"). "To have the 'social distinction' necessary to establish a particular social group, there must be evidence showing that society in general perceives, considers, or recognizes persons sharing the particular characteristic to be a group." *Matter of W-G-R-*, 26 I. & N. Dec. 208, 217 (BIA 2014).

Alvizuriz-Lorenzo has not cited to any record evidence showing that Guatemalan society perceives "girls or young women in Guatemala who cannot leave their family as a result of their age of economic conditions" or "girls or young women in Guatemala who cannot leave their family" as distinct groups. Alvizuriz-Lorenzo has certainly submitted credible evidence regarding the problem of gender-based violence in Guatemala. But, the evidence falls short of establishing that the record compels reversal. The issue is not how we would answer that question if we sat in the role of the IJ. Rather, the question is whether

12

the IJ's determination is unsupported by "reasonable, substantial, and probative evidence on the record considered as a whole." *Sanchez Jimenez*, 492 F.3d at 1231. In other words, we must ask if the record evidence compels reversal. *Id.* We cannot say that it does.

Additionally, the specialized legislation enacted to address gender violence in Guatemala does not show Alvizuriz-Lorenzo's purported social groups have social distinction. Rather, as the BIA acknowledged, the evidence showed general violence against women in Guatemala, not that Guatemalan society views the specific groups of "girls or young women in Guatemala who cannot leave their family as a result of their age of economic conditions" or "girls or young women in Guatemala who cannot leave their family" as distinct within society.[4]

## IV.    Conclusion

We acknowledge, as did the IJ and BIA, that Alvizuriz-Lorenzo suffered horrific harm at the hands of her family members. However, we cannot say the

---

[4] The BIA also affirmed the IJ's determination that Alvizuriz-Lorenzo's proposed social group was not analogous to the group the BIA found cognizable in *Matter of A-R-C-G-*, 26 I. & N. Dec. 388 (BIA 2014). *Matter of A-R-C-G-* was later expressly overruled by *Matter of A-B-*, 27 I. & N. Dec. 316 (2018). Subsequently, *Matter of A-B-* was abrogated in *Grace v. Whitaker*, 344 F. Supp. 3d 96, 125–27 (D.D.C. Dec. 19, 2018) (holding the attorney general's opinion in *Matter of A-B-* "was arbitrary and capricious"). *Grace* was appealed on January 30, 2019, and is currently pending in the D.C. Circuit. The Fifth Circuit recently considered the effect of *Grace* and held "the *Grace* injunction does not affect our ability to review or rely on *A-B-* in deciding [] case[s]." *Gonzales-Veliz v. Barr*, No. 18-60174, 2019 WL 4266121, at *5 (5th Cir. Sept. 10, 2019). To be clear, however, we decide this case without applying *Matter of A-R-C-G-*, *Matter of A-B-*, or *Grace*.

13

evidence in the record compels reversal of the IJ's findings, affirmed by the BIA, regarding particularity and distinction.[5] *See Castillo-Arias*, 446 F.3d at 1196. Thus, Alvizuriz-Lorenzo does not meet the INA's definition of a refugee and she is ineligible for asylum. *See* 8 U.S.C. § 1158(b)(1).

**PETITION DENIED.**

---

[5] Because Alvizuriz-Lorenzo is unable to establish that she suffered past persecution on account of a legally-cognizable particular social group, her challenge to the IJ's denial of humanitarian asylum under 8 C.F.R. § 1208.13(b)(1)(iii) necessarily fails. *See Perez-Zenteno v. U.S. Att'y Gen.*, 913 F.3d 1301, 1311 n.3 (11th Cir. 2019) ("[H]umanitarian asylum does not allow an applicant to receive asylum based on persecution unconnected to *any* statutorily protected ground.  She still must establish that she is a refugee, which requires a showing of past persecution on account of a statutorily protected ground.").   Our analysis concerning membership in a cognizable social group therefore also prevents Alvizuriz-Lorenzo from claiming humanitarian asylum.

WILSON, Circuit Judge, dissenting:

The Board of Immigration Appeals' (BIA) determination that Guatemala does not "view girls or young women in Guatemala who cannot leave their family as a result of their age or economic condition" or "girls or young women who cannot leave their family" as a socially distinct group is not supported by substantial evidence. For that reason, I dissent.

The majority sets forth the rape and sexual abuse suffered by Alvizuriz-Lorenzo at the hands of her grandfather and father. In addition, three months after her father's abuse ceased, she began working for her cousin and her cousin's husband (Bernardo), caring for their toddler. While her cousin was away, Bernardo told Alvizuriz-Lorenzo that she was wasting her time saving herself. Bernardo requested that Alvizuriz-Lorenzo show up early one day to care for the child, and when Alvizuriz-Lorenzo arrived, Bernardo raped and impregnated her. When Bernardo learned of her pregnancy, he threatened to kill her if she did not get rid of the child. Because Bernardo was a "very powerful man" with "lots of connections" in the police force, Alvizuriz-Lorenzo fled Guatemala and gave birth to her daughter in the United States.

At her merits hearing, Alvizuriz-Lorenzo acknowledged that there were prisons in Guatemala but stated that authorities did not incarcerate rapists because rape was "not something [that] the police investigate when it happens to women

15

there." Zury submitted three reports on Guatemala country conditions: (1) a 2015 Human Rights Report for Guatemala, which indicated that full investigation and prosecution of domestic-violence and rape cases took an average of one year, impunity for perpetrators was very high, and rape survivors frequently did not report crimes due to lack of confidence in the justice system, social stigma, and fear of reprisal; (2) the 2015/2016 Amnesty International Annual Report for Guatemala, which stated that violence against women continued to be systemic; and (3) a 2014 Human Rights Watch Report on Guatemala, which stated that violence against women in Guatemala was a chronic problem, perpetrators rarely faced trial, and reported rapes and sexual assaults increased by more than one-third between 2008 and 2011.

Alvizuriz-Lorenzo also submitted two articles that emphasized the pervasive nature of violence against women in Guatemala. The first stated that Guatemala had one of the highest rates of femicide—gender-motivated killing of women—in the world. The report also indicated that human trafficking and gender-motivated harm from sexual violence remains rampant, and that the government has failed to develop an effective response. The second article further underscored the violence committed against women in Guatemala.

At the end of the merits hearing, the IJ issued an oral decision denying Alvizuriz-Lorenzo's application for asylum, finding her removable. The IJ found

16

Alvizuriz-Lorenzo credible and determined that her sexual abuse and experiences rose to the level of past persecution under applicable regulations, but concluded that Alvizuriz-Lorenzo was not persecuted on account of a protected ground because her proposed social group was "not a cognizable particular social group for purposes of asylum."  Although the proposed group may have satisfied the "immutability" requirement, the IJ reasoned, it did not satisfy the "particularity" or "social distinction" requirements.

On appeal, the BIA affirmed the denial of Alvizuriz-Lorenzo's application for asylum.  By a 2-1 vote, the panel agreed with the IJ's finding that Alvizuriz-Lorenzo's past mistreatment rose to the level of past persecution, but also agreed that she had not been persecuted on account of a particular social group comprised of "girls or young women in Guatemala who cannot leave their family as a result of their age or economic conditions" because it lacked social distinction.  The third panel member issued a concurring and dissenting opinion, agreeing that Alvizuriz-Lorenzo had not established eligibility for asylum based on her religion, but asserting that her particular social group is cognizable.

Although we will "affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole," we will reverse if we find that the record compels, not merely supports, reversal.  *Sanchez*

17

*Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1231 (11th Cir. 2007).

## I. Membership in a Particular Social Group

To qualify as a refugee, a petitioner must demonstrate "(1) past persecution on account of a statutorily listed factor, or (2) a 'well-founded fear' that the statutorily listed factor will cause future persecution." *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1257 (11th Cir. 2006) (per curiam) (quoting 8 C.F.R. § 208.13(a), (b)). These factors include "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). If a petitioner can successfully demonstrate past persecution on account of a statutorily listed factor, there is a rebuttable presumption that she has a well-founded fear of future persecution. *Ruiz*, 440 F.3d at 1257.

We defer to the BIA's interpretation of "particular social group,"[1] which requires that the proposed group be (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question. *See, e.g.*, *Gonzalez v. U.S. Att'y Gen.*, 820 F.3d 399, 404 (11th Cir. 2016) (per curiam); *In re M-E-V-G-*, 26 I. & N. Dec. 227, 251–52 (B.I.A. 2014).

---

[1] We have held that the BIA's interpretation of "particular social group" is entitled to *Chevron* deference because the INA does not define the ambiguous phrase. *Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190, 1196 (11th Cir. 2006). We follow the BIA's interpretation of what constitutes a particular social group under the INA unless the interpretation is unreasonable, arbitrary, capricious, or clearly contrary to law. *Id.*

18

### A.  Immutability

An immutable characteristic is one "that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identifies or consciences."  *In re Acosta*, 19 I. & N. Dec. 211, 233 (B.I.A. 1985), *overruled on other grounds by In re Mogharrabi*, 19 I. & N. Dec. 439 (B.I.A. 1987).  The BIA provides a non-exhaustive list of immutable characteristics, such as "sex, color, or kinship ties, or in some circumstances, . . . a shared past experience such as former military leadership and land ownership."  *Id.*

The IJ and BIA noted that Alvizuriz-Lorenzo's proposed particular social group of "girls or young women in Guatemala who cannot leave their family as a result of their age or economic conditions" likely satisfies the immutability requirement.  Because Alvizuriz-Lorenzo's proposed social group is comprised of members who share a common immutable characteristic of gender—"girls or young women"—and kinship ties—"who cannot leave their family"—she satisfies the immutability requirement.  *See Gebremichael v. I.N.S.*, 10 F.3d 28, 36 (1st Cir. 1993) ("There can, in fact, be no plainer example of a social group based on common, identifiable and immutable characteristics than that of a nuclear family.").

### B.  Particularity

"A particular social group must be defined by characteristics that provide a

19

clear benchmark for determining who falls within the group." *In re M-E-V-G-*, 26 I. & N. Dec. at 239. The terms used to describe the proposed social group must have commonly accepted definitions in the society in question. *Id.*; *see also In re A-M-E & J-G-U-*, 24 I. & N. Dec. 69, 76 (B.I.A. 2007). Moreover, the "group must also be discrete and have definable boundaries—it must not be amorphous, overbroad, diffuse, or subjective." *In re M-E-V-G-*, 26 I. & N. Dec. at 239.

Satisfaction of the particularity element can vary depending on the cultural context involved. That is, a proposed social group can satisfy particularity in one region and simultaneously lack particularity in different region. *See In re W-G-R-*, 26 I & N Dec. 208, 214 (B.I.A. 2014) (explaining that the particularity element is not addressed in isolation but must be considered in the context of the society out of which the claim for asylum arises).

Alvizuriz-Lorenzo argues that each of the terms and phrases in her group definition—"girls or young women," "who cannot leave their family," "as a result of their age or economic conditions"—combine to describe a group with distinct boundaries *in her region*.

Guatemala has enacted laws[2] that have addressed intrafamily violence

---

[2] Guatemala enacted the 1996 Law to Prevent, Punish, and Eradicate Family Violence. *See* Karen Musalo & Blaine Bookey, *Crimes Without Punishment: An Update on Violence Against Women and Impunity in Guatemala*, 10 HASTINGS RACE & POVERTY L.J. 265, 274 (2013), https://cgrs.uchastings.edu/sites/default/files/Musalo_Bookey_CrimesWithoutPunishment_2013.pdf. The objective of the 1996 Law was to prevent intrafamily violence through a protective measure but was not intended to punish the aggressors. *Id.* at 275. Prior to 2008, the 1996 Law

against women, and, importantly, there is a widely recognized lack of enforcement of these laws.  Guatemala thus purports to give Alvizuriz-Lorenzo relief from her family's atrocious acts—in the form of prosecuting her family members under the laws of Guatemala—but nonetheless refuses to enforce those laws.  As Alvizuriz-Lorenzo testified at her merits hearing, she did not formally report her family's abuse because it is a generally accepted truth in Guatemalan society that police refuse to help in instances of rape.  An affidavit from a Guatemalan police officer corroborates the veracity of this claim.  Police officer Giovani David Lorenzo Estevan indicated that women of sexual crimes refuse to file formal complaints for fear of "reprisals by the alleged perpetrator or syndicate and due to the tedious, cumbersome and delayed criminal proceedings of the Guatemalan justice system, which, instead of prompt and effective justice, revictimizes the victims psychologically."

Alvizuriz-Lorenzo further testified that she spoke with a young girl from Guatemala who was sexually abused by her father.  The girl reported the abuse to police, but she was told that her formal complaint would be "a waste of time" and that she should simply "deal with it."  The police informed the young girl that the

---

was the only law to address violence against women.  *Id.* at 274.  In 2008, Guatemala enacted the Law Against Femicide and Other Forms of Violence Against Women.  *Id.*  While the 2008 Law criminalized a range of acts of violence against women, Guatemala's efforts to enforce the 2008 Law have had minimal impact on the heightened levels of violence and rates of impunity for such crimes.  *Id.* at 279.

police do not get involved in family relationships and that she should resolve the problem on her own.

This continuous lack of prosecution for intrafamily violence against women has left Alvizuriz-Lorenzo without recourse to distance herself from her family. And the fact that many women in Guatemala suffer from the same hindrance to justice, thereby ensuring the cohesiveness of the family unit remains unscathed, supports the conclusion that the terms used to describe Alvizuriz-Lorenzo's proposed social group—"girls or young women . . . who cannot leave their family as a result of their age or economic conditions"—have "commonly accepted definitions" within Guatemalan society. *See In re M-E-V-G-*, 26 I. & N. Dec. at 239. Thus, I would find that Alvizuriz-Lorenzo's proposed particular social group sufficiently satisfies the particularity element.

## C. Socially Distinct

An applicant for asylum must additionally show that her particular social group is "socially distinct within the society in question." *Id.* at 252. A group is socially distinct if there is "evidence showing that society in general perceives, considers, or recognizes persons sharing the particular characteristic to be a group." *In re W-G-R-*, 26 I. & N. Dec. at 217. Social distinction, formerly called social visibility, does not require the group to be "ocularly visible to others in society." *In re M-E-V-G-*, 26 I. & N. Dec. at 240. That is, "[s]ociety can consider

22

persons to comprise a group without being able to identify the group's members on sight." *Id.* Rather, social distinction refers to social recognition: "it must be *perceived* as a group by society." *Id.* (emphasis added).

Determining social distinction is an "evidence-based inquiry as to whether the relevant society recognizes [the] particular social group." *Pirir-Boc v. Holder*, 750 F.3d 1077, 1084 (9th Cir. 2014). This evidence-based inquiry includes society-specific evidence, "such as country conditions reports, expert witness testimony, and press accounts of discriminatory laws and policies, historical animosities, and the like." *In re M-E-V-G-*, 26 I. & N. Dec. at 244 (internal quotation marks omitted).

Alvizuriz-Lorenzo contends that the record evidence demonstrates the frequency of intrafamily violence in Guatemala and the country's unsuccessful attempts to curtail such violence. She argues that Guatemala's attempt to criminalize violence in familial relationships strongly indicates that Guatemalan society views her proposed social group as distinct within society.

The record evidence establishes that Guatemalan society recognizes the particular vulnerability of young girls and women unable to leave their families. Incest, for example, is one of the pervasive forms of violence against women in Guatemala. *See* Musalo & Bookey, *supra* note 2, at 269 ("Violence against women pervades all sectors of Guatemalan society. The violence takes many

23

brutal forms, including intra-familial (or domestic) violence, sexual violence, incest, human trafficking, and, at the extreme end of the spectrum, femicide."). The Guatemalan government evidently recognizes the prevalence of intrafamily violence against women and children, as evidenced by the 2015 Guatemala Human Rights Report. The Human Rights Report notes that the Guatemalan government specifically tracks the number of "intrafamily violence against women and children," and even goes to the extent of distinguishing between sexual crimes against women and the "sexual exploitation of children." U.S. Dep't of State, Bureau of Democracy, Human Rights, and Labor, *Country Reports on Human Rights Practices for 2015:Guatemala 2015 Human Rights Report* 14–18, https://2009-2017.state.gov/documents/organization/253229.pdf. The Human Rights Report also indicates that Guatemalan society acknowledges the prevalence of young women remaining subservient to elder family members—the Guatemalan "Congress eliminated a provision that previously allowed girls to marry at 14 . . . with parental consent" precisely to prevent forced marriage and sexual relations. *Id.* at 18. The concern for young girls and women unable to safely distance themselves from their harmful familial relationships is further exacerbated by Guatemala's culture of "machismo and family violence." *Id.*

These efforts to protect women from family abuse, albeit unsuccessful, indicate that Guatemalan society recognizes the vulnerability of young girls and

women unable to leave their families.  I would conclude that a particular social group consisting of "girls or young women in Guatemala who cannot leave their family as a result of their age or economic conditions" is viewed by Guatemalan society as socially distinct.   The record "fairly compels the conclusion" that Zury suffered past persecution on account of a cognizable particular social group.  *See Sanchez Jimenez*, 492 F.3d at 1232.  Thus, there is a rebuttable presumption that she has a well-founded fear of future persecution.  *See Ruiz*, 440 F.3d at 1257.

## II.  Humanitarian Asylum

Even in the absence of a well-founded fear of future persecution, Alvizuriz-Lorenzo may still be entitled to a discretionary grant of humanitarian asylum.  *See In re L-S-*, 25 I. & N. Dec. 705, 710 (B.I.A. 2012).  An asylum applicant who has established past persecution on account of a statutorily protected ground, but no longer has a well-founded fear of future persecution, may nonetheless be entitled to a discretionary grant of humanitarian asylum by establishing that she has "'compelling reasons,' arising out of the severity of past persecution, for being unable or unwilling to return to [her] country under [8 C.F.R.] § 1208.13(b)(1)(iii)(A) . . . ."  *In re L-S-*, 25 I. & N. Dec. at 710.  Applicants are eligible for humanitarian asylum based on these grounds when they have suffered "an atrocious form of persecution that results in continuing physical pain and discomfort."  *Id.* at 712.  In other words, the applicant must establish that the "past

25

persecution was so severe that repatriation would be inhumane." *Abrha v. Gonzales*, 433 F.3d 1072, 1076 (8th Cir. 2006). To determine whether the past persecution was so severe as to warrant humanitarian asylum relief, we focus on "the degree of harm suffered, the length of time over which the harm was inflicted, and evidence of psychological trauma resulting from the harm." *Id.*

In analyzing whether Alvizuriz-Lorenzo was entitled to humanitarian asylum, the IJ explained that, in the absence of a well-founded fear of future persecution, she must demonstrate compelling reasons for being unwilling or unable to return to Guatemala due to the severity of the past persecution. Notwithstanding the fact that the IJ previously found (1) Alvizuriz-Lorenzo's testimony credible, (2) that "she suffered very serious harm by [her] family members," and (3) that her sexual abuse and rape rose to the level of past persecution required under the INA, the IJ ultimately determined that the past persecution was not on account of her membership in a cognizable particular social group. I would conclude that Alvizuriz-Lorenzo is entitled to humanitarian asylum because the past persecution she suffered on account of her membership in a particular social group "was so severe that repatriation would be inhumane." *See id.*

Humanitarian asylum "is reserved for the most extraordinary cases." *Mehmeti v. U.S. Att'y Gen.*, 572 F.3d 1196, 1201 (11th Cir. 2009) (per curiam).

26

Alvizuriz-Lorenzo's case rises to that level on account of "the degree of harm suffered, the length of time over which the harm was inflicted, and evidence of psychological trauma resulting from the harm." *See Abrha*, 433 F.3d at 1076. Alvizuriz-Lorenzo was terrorized by her family as a victim of incest and sexual abuse by her grandfather and father for over 12 years. Just when she thought these atrocious acts were over, she was raped, impregnated, and threatened by her cousin's husband. The severity of this harm constitutes an egregious form of persecution that entitles her to humanitarian asylum under 8 C.F.R. § 1208.13(b)(1)(iii)(A).

The BIA erred in determining that Alvizuriz-Lorenzo was not persecuted on account of her membership in a cognizable particular social group. The record evidence compels a finding that she suffered persecution on account of her membership in a cognizable particular social group. "[T]he IJ should have shifted the burden to the government to rebut the presumption that [Alvizuriz-Lorenzo] had a well-founded fear of future persecution. *See Marin v. U.S. Att'y Gen.*, 253 F. App'x 830, 834 (11th Cir. 2007).

Accordingly, I would vacate the IJ's decision denying asylum and remand to the BIA to give the government the opportunity to rebut the presumption that

27

Alvizuriz-Lorenzo has a well-founded fear of future persecution.  *See id.*[3]

---

[3] I also note that, in *In re A-R-C-G-*, 26 I. & N. Dec. 388 (B.I.A. 2014), the BIA recognized "married women in Guatemala who were unable to leave their relationship" as a particular social group, but that *In re A-B-,* 27 I. & N. Dec. 316 (A.G. 2018), overruled it.  Subsequently, the District Court for the District of Columbia, in a published opinion, permanently enjoined application of *In re A-B-*, concluding that the decision is "arbitrary and capricious and violates the immigration laws."  *Grace v. Whitaker*, 344 F. Supp. 3d 96, 105, 125–27 (D.D.C. 2018).  Given the similarity, at the very least, I would accept the government's alternative request to remand for the BIA to address in the first instance the impact of *In re A-B-*.  The *In re A-R-C-G-* analysis was flawed.